## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

**UNITED STATES OF AMERICA**

**v.**                                             **Criminal No. 2:21-cr-00086**

**DAVID LEE BUMGARNER**

### DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

Defendant, David Lee Bumgarner, by his counsel, moves this Court, pursuant to Rule 12(b)(3)(C) of the Federal Rules of Criminal Procedure and the Fourth Amendment of the United States Constitution, for the entry of an appropriate Order suppressing the introduction of all physical evidence illegally seized as the result of a June 6, 2020, warrantless police search of a Chevrolet S-10 pickup truck driven by the defendant. The defendant specifically seeks the suppression of the following items of seized evidence:

1.   A SCCY, model CPX-2, 9mm pistol and its magazine which contained five rounds of ammunition;

2.   The May 3, 2021, results of the FBI Laboratory's probabilistic genotyping analysis of a mixture of DNA taken from the grip of pistol and compared with a known sample of DNA taken from the defendant; and

3.   All photographs taken of the Chevrolet S-10 pickup truck and the seized SCCY 9mm pistol taken by the West Virginia State Police.

In support of this Motion, the defendant states as follows:

**A.** **On June 6, 2020, Patrolman M.S. Hall of the Chapmanville Police Department conducted a traffic stop of a Chevrolet S-10 pickup truck driven by the defendant.**

(1)     On June 6, 2020, the defendant borrowed a Chevrolet S-10 pickup truck from its owner, Keith McCloud, a Logan County resident who lived in the area known as Pecks Mill.  The defendant drove Mr. McCloud's pickup truck to the Towne N' Country Foodland grocery store located in Chapmanville, West Virginia. The defendant's girlfriend, Elizabeth Evans, accompanied the defendant to the grocery store and sat in the front passenger seat.  After their shopping had been completed, the defendant and Ms. Evans loaded their groceries into the back of the pickup truck and headed back to Mr. McCloud's home.  The defendant was traveling on Route 10 through Chapmanville when an unmarked police car turned on its blue lights directing him to pull over.

(2)     On June 6, 2020, Patrolman M.S. Hall of the Chapmanville Police Department was on road patrol in an unmarked car when he reportedly observed the driver of a Chevrolet S-10 pickup truck not wearing a seat belt.  The pickup truck was traveling on Route 10 through Chapmanville.  When Patrolman Hall followed the pickup truck, he reportedly noticed the driver's right arm reaching around and behind the front passenger's seat while driving.  Patrolman Hall's submitted report of the traffic stop makes no mention of him seeing any objects in the defendant's hand.  The defendant's actions purportedly caused the truck to swerve and briefly cross the centerline of traffic a couple of times.  As Patrolman Hall believed that he had just observed two driving violations, he turned on his blue

2

lights and initiated a traffic stop of the pickup truck. Patrolman Hall's unmarked car and the pickup truck pulled into a large parking lot of a funeral home without further incident.

(3)     Patrolman Hall approached the pickup truck on the driver's side and asked the defendant for his license and registration. The defendant responded that he did not have an operator's license and began to look for Mr. McCloud's registration and insurance documentation in the glovebox. Patrolman Hall then returned to his car to radio his dispatcher for check on the status of the defendant's license.

(4)     Shortly after Patrolman Hall returned to his car, West Virginia State Police Senior Trooper Z.S. Holden arrived at the scene to assist Patrolman Hall with the stop. Trooper Holden personally knew the defendant as he had been involved in a previous arrest of the defendant on another charge. Trooper Holden had a brief conversation with Patrolman Hall, who advised him of the traffic violations which he had observed. Trooper Holden walked to the driver's side of the pickup truck, opened the door, and physically removed the defendant from his seat. Trooper Holden told the defendant that he should not have been driving, and he placed the defendant in handcuffs. Trooper Holden took the defendant back to his State Police SUV and detained him in the back seat of the SUV. In the meantime, the dispatcher responding to Patrolman Hall's inquiry indicated that the defendant's driver's license had been revoked and that he had a history of unpaid citations.

(5)     Trooper Holden then walked over to the passenger side of the pickup truck where Elizabeth Evans had been waiting for the duration of the stop. According to Trooper Holden, Ms. Evans appeared to be "extremely nervous" and was looking around the interior of the vehicle.   Trooper Holden reported seeing syringe caps in the floorboard area below where Ms. Evans was seated.   Upon information and belief, Trooper Holden did not question Ms. Evans about whether she had any drugs on her person or somewhere in the pickup truck.   Trooper Holden directed Ms. Evans to get out of the pickup truck.   Ms. Evans complied with the request and remained standing away from the pickup truck.   The passenger door was left open.

(6)     Trooper Holden leaned in through the open passenger door and started looking underneath the front passenger's seat.   Trooper Holden observed a handgun that was located towards the rear righthand corner underneath the front passenger seat.   The location of the concealed handgun was such that it would have been impossible for Trooper Holden to have observed it while he was standing outside of the pickup truck.   The portion of Trooper Holden's upper body which leaned into the interior of the pickup truck constituted a search of the pickup truck which remains protected by the Fourth Amendment.

(7)     Trooper Holden did not immediately retrieve the handgun after his initial observation.   Instead, Trooper Holden returned to his SUV to retrieve his digital camera to document the location of where he had observed the handgun. Once Trooper Holden indicated he had found a gun, Patrolman Hall and an

unidentified second Chapmanville police officer who had arrived after Trooper Holden started rummaging through the interior of the pickup truck.

(8)     The first picture taken by Trooper Holden depicted the rear of the pickup truck showing both the driver's and passenger's doors open.  In this picture, Patrolman Hall can be seen leaning in towards the opening in the driver's side.  A second unidentified Chapmanville Police officer can also be seen leaning over the front passenger's seat with his attention directed towards the middle console area. According to the metadata for this digital picture, it was taken at 5:57 p.m. on June 6, 2020 with a Canon PowerShot camera.  A copy of this photograph has been attached as Exhibit A.

(9)     The second picture taken by Trooper Holden depicts the handgun where it was found under the right rear corner of the passenger's seat.  According to the metadata, the picture was taken one minute after the first picture at 5:58 p.m. A copy of this photograph has been attached as Exhibit B.  Trooper Holden took two additional pictures of the handgun after he placed it on the floorboard area in front of the passenger's seat.   These two digital photographs have been attached as Exhibits C and D and were taken at 5:58 p.m. on June 6, 2020.  No syringe caps appeared in any of the photographs taken by Trooper Holden or were otherwise kept for evidentiary purposes.  The handgun was later identified to be a SCCY 9mm pistol which was found to contain a magazine with five rounds of ammunition.

(10)    Patrolman Hall and Trooper Holden did not question the defendant about the discovery of the handgun or who it belonged to.  No other contraband was

5

found in the pickup truck.    The defendant was subsequently charged in Logan County Magistrate Court with driving on a revoked license and being a felon-in-possession of a firearm.

**B.    The FBI Laboratory's analysis of a sample of DNA from the grip of the handgun reported a possible connection with a known sample of the defendant's DNA.**

(11)    On January 5, 2021, the FBI became involved when FBI Special Agent Adam Bennett traveled to the West Virginia State Police's office in Logan County to take custody of the seized 9mm pistol.  Agent Bennett proceeded to ship the firearm and the magazine containing five rounds of ammunition to the FBI Laboratory in Quantico, Virginia.  A lab technician used a buccal swab along the grip of the pistol to collect a sample of DNA for analysis.  The FBI Laboratory subsequently notified FBI Special Agent Adam Bennett that the sample contained a sufficient amount of DNA suitable for analysis and that a known sample of DNA from the defendant was needed for comparison.

(12)    On March 23, 2021, Agent Bennett obtained two buccal swabs containing the defendant's DNA from the defendant, who was in custody at Southwestern Regional Jail, and sent them to the FBI Laboratory.  On May 3, 2021, the FBI Laboratory issued a three-page report setting forth the results of the DNA analysis.  The FBI Laboratory concluded that the sample of DNA removed from the grip of the pistol contained a mixture of DNA from four different individuals, one of whom was a male.  The presence of DNA from multiple sources required the FBI Laboratory to conduct further analysis as it was no longer possible to make a

definitive one-to-one DNA comparison with the known sample taken from the defendant.

(13)    The FBI input the results of the DNA mixture into a relatively new probabilistic genotyping software program called "STRMix."  This computer program develops a statistical estimate regarding the possibility that some of the DNA found on the firearm belonged to the defendant or to another individual.  The statistical analysis concluded that it is 120 times more likely that the mixture of DNA found on the handgun came from the defendant and three unknown, unrelated persons than if it came from four unknown, unrelated persons.  The calculated likelihood ratio falls within one of the lower ranges for support on the FBI's reported scale for inclusion.  According to the STRMix report, an unknown person identified as "Contributor 1" contributed 51% of the DNA in the sample.  The defendant was identified as "Contributor 2" who contributed 24% of the sample.  Unknown persons identified as "Contributor 3" and "Contributor 4" were found to have contributed 16% and 9% of the sample.  The FBI's May 3, 2021, report and relevant portions of the disclosed case file on the DNA analysis have been attached as Exhibit E.

## Legal Grounds for Suppression of Evidence

**I.    The defendant, having the express permission of the owner to borrow and operate the pickup truck, has standing to challenge the unlawful June 6, 2020, search.**

(14)    To establish standing to challenge a search warrant, the party challenging the search must show that he has a legitimate expectation of privacy in

the property that was searched.  *Byrd v. United States,* 138 S. Ct. 1518, 1528 (2018); *United States v. Rose*, 3 F.4th 722 (4th Cir. 2021).   One who lawfully possesses or controls the property at issue is considered likely to have a legitimate expectation of privacy. *Byrd,* 138 S. Ct. at 1528; *Rose* 3 F.4th at 727.   Courts have consistently recognized that where a person has the permission of the owner to drive a vehicle, that person has a reasonable expectation of privacy in the vehicle and standing to challenge any search.  *United States v. Thomas*, 447 F.3d 1191, 1198 (9th Cir. 2006); *United States v. Miller*, 821 F.2d 546, 548-549 (11th Cir. 1987).

(15)   At all times pertinent, the defendant was in lawful possession and control over the Chevrolet S-10 pickup truck owned by Keith McCloud.   Mr. McCloud was subsequently interviewed by the State Police and verified his ownership of the Chevrolet S-10 pickup truck.   Mr. McCloud further verified that the defendant had borrowed his pickup truck from him on June 6, 2021.   As such, the defendant had a reasonable expectation of privacy to challenge the legality of the June 6, 2020, warrantless search.

**II.    As Trooper Holden did not develop probable cause of any ongoing criminal activity involving the defendant or Ms. Evans, his leaning into the open side to locate the firearm constitutes an illegal search which does not fall within the plain view exception.**

(16)   The Fourth Amendment protects the rights of all citizens from unreasonable searches and seizures of their homes.  *Davis v. United States*, 131 S. Ct. 2419, 2426 (2011); *United States v. Doyle*, 650 F.3d 460, 466 (4th Cir. 2011). A vehicle stop is considered as a seizure within the Fourth Amendment.  *United States v. Bowman*, 884 F.3d 200, 209 (4th Cir. 2018).   An officer's decision to stop a

8

car is considered to be reasonable if the officer has probable cause to believe that a traffic violation has taken place. *Bowman*, 884 F.3d at 209. The defendant is not challenging Patrolman Hall's decision to stop the pickup truck based on his observation that the defendant was driving without a seat belt.

(17) The Fourth Amendment generally requires judicially approved warrants as a prerequisite to any law enforcement search of property unless one of the recognized exceptions can be satisfied. Three conditions have to be met in order for a seized item of contraband can be considered as falling within the scope of the plain view exception. First, the seizing officer must be lawfully present in the place from which he can plainly view the evidence. Second, the officer must have a lawful right of access to the object itself. Third, it must be immediately apparent to the officer that the item seized is incriminating on its face. *Horton v. California,* 496 U.S. 128, 136 (1990); *United States v. Williams,* 592 F.3d 511, 521 (4th Cir. 2010). The rationale for the plain view exception is that if contraband is left out in the open and can be readily observable by police from a lawful vantage point, there has been no invasion of privacy. *Horton*, 496 U.S. at 133; *Williams*, 592 F.3d at 521.

(18) Underlying the plain view exception is the requirement that the officer be lawfully present at the location from which the property could be plainly viewed. *United States v. Jackson*, 131 F.3d 1105, 1109 (4th Cir. 1997); *United States v. Stanfield*, 109 F.3d 976, 981 (4th Cir. 1992). With respect to this case, Trooper Holden could only seize contraband items which he readily observed from his vantage point outside of the pickup truck. Once any portion of Trooper Holden's

9

upper body entered the interior space of the pickup truck, Trooper Holden engaged in a warrantless search of the interior space. *See New York v. Class*, 475 U.S. 106, 115 (1986). In *Class*, the Supreme Court held that "while the interior of an automobile is not subject to the same expectations of privacy that exist with respect to one's home, a car's interior as a whole is nonetheless subject to Fourth Amendment protection from unreasonable intrusions by the police."

(19)   Courts have applied the plain view exception where contraband items could readily be seen by officers looking through the windows or open doors of a parked vehicle. *See United States v. Johnson*, 599 F.3d 399, 347 (4th Cir. 2010); *United States v. Rumley*, 588 F.3d 202, 204 (4th Cir. 2009). The plain view exception can not be relied upon as a basis for the seizure of the handgun given its concealed location as shown in the picture taken by Trooper Holden. *See* Ex. B.

(20)   A police officer cannot search the interior of a vehicle stopped for a traffic violation unless he first obtains consent from the driver or owner, obtains a warrant, or develops probable cause to believe that the vehicle contains evidence of criminal activity. *United States v. Palmer*, 820 F.3d 640, 650 (4th Cir. 2016); *United States v. Baker*, 719 F.3d 313, 319 (4th Cir. 2013). Probable cause to search a vehicle exists when "reasonable officers can conclude that what they see, in light of their experience, supports an objective belief that contraband is in the vehicle." *United States v. Ortiz*, 669 F.3d 439, 446 (4th Cir. 2012). "Probable cause requires an officer to have a "'reasonable ground for belief of guilt and more than bare

suspicion.'" *Ortiz*, 669 F.3d at 446 (4th Cir. 2012); quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949).

(21)    Trooper Holden failed to develop probable cause that the pickup truck contained any contraband items or that the defendant and his passenger were presently engaged in any illegal activity before entering the pickup truck. Patrolman Hall's initial stop was based solely upon his observation that the defendant was observed committing misdemeanor traffic violations.  There are no reports in this case that the defendant or Ms. Evans was under surveillance or had outstanding arrest warrants.  No incriminating remarks have been attributed to the defendant during his interactions with Patrolman Hall and Trooper Holden. Patrolman Hall and Trooper Holden never observed any drugs in plain view in the interior of the pickup truck.  Any observation about the presence of an unspecified number of syringe caps around the floorboard area of the passenger side, without further questioning or investigation, would not support any finding of probable cause for a search of the pickup truck.

For the reasons set forth herein, as well as the additional legal reasons set forth in the accompanying Memorandum in Support, the defendant moves this Court to grant this Motion to Suppress and preclude the Government from introducing any of the items of physical evidence identified in this Motion.

Respectfully submitted this 22nd day of September, 2021.

                                   **DAVID LEE BUMGARNER**

                                   **By Counsel**

**WESLEY P. PAGE**
**FEDERAL PUBLIC DEFENDER**

**s/David R. Bungard**
David R. Bungard, Bar Number: 5739
Assistant Federal Public Defender
Office of the Federal Public Defender
300 Virginia Street, East, Room 3400
Charleston, West Virginia  25301
Telephone: (304) 347-3350
Facsimile: (304) 347-3356
E-mail: david_bungard@fd.org

12