**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                    CRIMINAL ACTION NO. 2:21-cr-00086

DAVID LEE BUMGARNER,

        Defendant.

**MEMORANDUM OPINION AND ORDER**

The Court has reviewed the *Defendant's Motion to Suppress Evidence* (Document 25) and the *Memorandum in Support of Defendant's Motion to Suppress Evidence* (Document 26). The Court has also reviewed the *Response of the United States of America to Defendant's Motion to Suppress* (Document 38) and the *Defendant's Reply to the Government's Response to Defendant's Motion to Suppress* (Document 39).   In addition, the Court has considered the evidence and testimony presented during the suppression hearing held on December 2, 2021.   For the reasons stated herein, the Court finds that the motion should be granted and the evidence in question should be suppressed.

**FACTUAL BACKGROUND**

On June 10, 2021, David Lee Bumgarner was charged in a single count indictment as a Felon in Possession of a Firearm, in violation of 18 U.S.C §§ 922(g)(1) and 924(a)(2).   He filed a motion to suppress evidence on September 22, 2021, and the Court held a hearing on the motion on December 2, 2021.   Mr. Bumgarner seeks to have the following evidence suppressed: (1) "A SCCY, model CPX-2, 9mm pistol and its magazine which contained five rounds of ammunition";

(2) "[t]he May 3, 2021, results of the FBI Laboratory's probabilistic genotyping analysis of a mixture of DNA taken from the grip of [the] pistol and compared with a known sample of DNA taken from the defendant"; and (3) "[a]ll photographs taken of the Chevrolet S-10 pickup truck and the seized SCCY 9mm pistol taken by the West Virginia State Police." (Document 25).

At the suppression hearing, in addition to viewing the photographs, relevant to the motion, the Court heard the testimony of the two law enforcement officers most intimately involved in the traffic stop and seizure of the firearm, namely, Trooper Zachary Holden and Patrolman Michael Hall.   Based on the briefings, and the evidence and testimony presented at the hearing, the Court finds the following.

On June 6, 2020, the Defendant, David Lee Bumgarner, was driving a Chevrolet S-10 pickup truck in Chapmanville, West Virginia.   Mr. Bumgarner had borrowed the truck from his neighbor, Keith McCloud.   Patrolman Hall, of the Chapmanville Police Department, was patrolling in an unmarked car when he reportedly observed the driver of the truck, heading in the opposite direction, not wearing a seatbelt.   Patrolman Hall switched on the light that was inside his unmarked vehicle and turned around to stop the defendant.   At the suppression hearing, Patrolman Hall gave multiple conflicting responses regarding the time during which he followed Mr. Bumgarner.   First, he claimed it took 30 seconds to one minute, next he stated that it was 20 seconds, he then testified again that it was approximately 30 seconds to one minute, and finally he claimed it was about a minute.   He noted that the truck did not speed up or attempt to flee before pulling over.[1]

---

1 In its reply to the *Motion to Suppress*, the United States portrayed a scenario where Mr. Bumgarner sought to avoid the traffic stop and delay being pulled over.   Among other descriptions, the United States described Mr. Bumgarner as evasive, refusing to pull over, and that he finally complied after an inappropriate amount of time.   The brief also accuses Mr. Bumgarner of failing and refusing to comply with the police.   That portrayal is inconsistent with the

Mr. Bumgarner pulled the truck into a large parking lot of a funeral home.[2]  Patrolman Hall later reported that before pulling into the parking lot, he had observed the driver of the truck reaching around and behind the front passenger seat of the truck but noted that he did not inform anyone of this prior to the seizure of the gun that is the subject of the motion.   He also testified that despite seeing the driver move, he could not recall whether the passenger made any movements.

Once stopped in the parking lot, Mr. Bumgarner waited in the truck for the officer. Patrolman Hall approached Mr. Bumgarner, and interacted with him and the passenger, Elizabeth Evans, for approximately two minutes.   Despite Patrolman Hall's testimony that he had been trained that with respect to every suspect "[t]hey're always out to kill you,"[3] he testified that the interaction took place without incident.   During the interaction, Patrolman Hall did not ask Mr. Bumgarner if he was armed or if there was a gun in the vehicle, he did not ask about the supposed furtive movements he had observed, he did not inquire about Mr. Bumgarner's alleged failure to pull over promptly, he did not ask either Mr. Bumgarner or Ms. Evans to exit the truck nor did he perform a pat down search of either.   Further, Patrolman Hall testified that he did not view anything that indicated either Mr. Bumgarner or Ms. Evans were actively engaged in any criminal activity aside from the moving violation justifying the stop.   He returned to his vehicle to run Mr. Bumgarner and Ms. Evans' names through the central 911 system.   He testified that he left them in the vehicle because he did not believe Mr. Bumgarner posed a safety risk.

---

United States' evidence.   Patrolman Hall described a different chain of events as highlighted above.   Further, as detailed below, there are significant contradictions as to whether the officer who removed Mr. Bumgarner from the car was aware of Mr. Bumgarner's supposed evasiveness and refusal to comply, even if it occurred.   Thus, the portrayal is possibly irrelevant.
2  At the suppression hearing, Patrolman Hall noted that the parking lot was likely the largest parking area in the downtown area of Chapmanville where the stop occurred.
3  December 2, 2021, Tr., p. 37:18 (Document 48).

A few minutes later, Trooper Holden, of the West Virginia State Police, arrived on the scene.   At the time he arrived, Patrolman Hall had taken no steps to further restrain Mr. Bumgarner or Ms. Evans, either inside or outside the vehicle.   The two officers tell conflicting stories of what happened next.   Trooper Holden claims he initially arrived on the scene and spoke with Patrolman Hall to acquire the details of what had occurred.   Patrolman Hall denies such a discussion took place prior to Trooper Holden's contact with Mr. Bumgarner.   Trooper Holden cited details which he claims he obtained from Patrolman Hall, prior to approaching Mr. Bumgarner, as justification for his actions.   He stated that he relied on Patrolman Hall's purported statements to him about the length of time it took Mr. Bumgarner to pull over, and the motions he made while driving.   In addition to denying the conversation occurred, as Trooper Holden had claimed, Patrolman Hall confirmed that he had not shared any of the details over the radio.

Trooper Holden approached the truck and asked Mr. Bumgarner to step out.   He claimed a familiarity with Mr. Bumgarner, but it was based almost exclusively on information he received from other officers.   He testified that he knew Mr. Bumgarner had a history of fleeing the scene or becoming combative with officers.[4]   When Mr. Bumgarner stepped out of the truck, he gave no indication that he was attempting to flee.   Trooper Holden claims he patted Mr. Bumgarner down but no gun was found.   Mr. Bumgarner was then placed in handcuffs, taken to Trooper Holden's vehicle, and locked in the back seat.

With Mr. Bumgarner detained in the back seat, Trooper Holden returned to the truck to remove Ms. Evans.   He claims that upon approaching the vehicle, he saw orange syringe caps on

---

4 Trooper Holden mentioned knowledge that Mr. Bumgarner had been a suspect in prior investigations but gave no indication that he knew Mr. Bumgarner had a prior felony conviction at the time of the interaction.   He also acknowledged that he had never witnessed or been involved in any interaction where Mr. Bumgarner had been combative or attempted to flee.

4

the floor of the truck.   However, no photographs were taken of the caps, and there was no testimony that caps were kept as evidence.[5]   Upon removing Ms. Evans from the truck and Patrolman Hall taking her away from it, Trooper Holden claimed he saw a firearm in plain view under the front passenger seat.

The Chevrolet S-10 truck had two seats in the front cabin.   Trooper Holden, at the time he claimed to see the gun, was standing upright outside the vehicle beside the passenger side rearview mirror.   From that vantage point, he claims he could see the firearm butt and magazine, despite it being confined entirely under the seat, out of the sunlight, and at approximately knee height or below.[6]   Although he claimed that he was able to see the gun while standing straight up and without bending into the vehicle, he only took photographs of the gun from inside the truck, and acknowledged he needed to bend down and enter the truck to obtain this photo:

---

[5] Although Trooper Holden took several photographs of multiple angles inside the truck, he did not take any photographs evidencing syringe caps despite citing them as a source of his suspicion.

[6] During testimony, Patrolman Hall acknowledged that the firearm was entirely under the passenger seat, and Trooper Holden acknowledged that the distance from the seat to the floorboard was likely less than one foot.



(Document 25-2).   This photograph, the only one depicting where the firearm was allegedly positioned before the officer moved it, shows the butt of the gun hidden in a dark area completely under the passenger seat.   While Trooper Holden took numerous photographs that day, none illustrate his view from outside the truck.[7]   Initially, in looking at the photograph, Trooper Holden claimed he could not testify as to whether it was fully under the seat or whether any part of the firearm was sticking out.   Despite this assertion, he claimed with certainty that the gun was in plain view.   Upon further questioning, he ultimately acknowledged that the firearm, as the photograph he was viewing depicts, was, in fact, under the seat.   Additionally, he later admitted that in his report from that day, he had described the gun as concealed underneath the seat.

When questioned, Patrolman Hall testified that he did not recall whether he ever heard from central 911 regarding Mr. Bumgarner's background check and eligibility to drive, much less

---

7 When questioned about the photograph, which clearly shows the gun behind the line of sunlight entering the car, Trooper Holden claimed that he could not be sure if it was an accurate depiction of the sunlight when he viewed the firearm initially. He asserted that even though he took the photograph almost immediately after viewing the firearm, a cloud could have entered at the moment he took it.

whether he obtained that information before the seizure.   Further, while they ultimately did find a syringe in Ms. Evans' purse, Patrolman Hall acknowledged that this was found after both passengers were out of the car, and after the gun had been seized.

## STANDARD OF REVIEW

When deciding a motion to suppress, the district court may make findings of fact and conclusions of law.   *United States v. Stevenson,* 396 F.3d 538, 541 (4th Cir. 2005).   On a motion to suppress, the burden of proof is on the party who seeks to suppress the evidence.   *United States v. Dickerson*, 655 F.2d 559, 561 (4th Cir. 1981).   However, once the defendant establishes a proper basis for his motion to suppress, the burden shifts to the government to prove the admissibility of the challenged evidence by a preponderance of the evidence.   *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974).

## DISCUSSION

The Fourth Amendment to the United States Constitution protects people against unreasonable searches or seizures.   U.S. Const. amend. IV.   Warrantless searches and seizures are presumptively unreasonable and violative of the Fourth Amendment, subject to limited exceptions.   *Katz v. United* States, 389 U.S. 347, 357 (1967).   Evidence obtained because of that unreasonable search is therefore inadmissible absent an exception that would allow the Government to introduce it.   *See Elkins v. United States*, 364 U.S. 206, 212-13 (1960).   The Supreme Court has identified a limited number of exceptions that may permit the government to conduct a warrantless search.   Absent one of these exigencies or specific exceptions, evidence seized during an unreasonable warrantless search must be suppressed under the exclusionary rule. *United States v. Calandra*, 414 U.S. 338, 347 (1974).

7

To support law enforcement's seizure here, the United States has pointed to four potential legal justifications for the warrantless search of the truck and warrantless seizure of the firearm: (1) the plain view doctrine, (2) a protective sweep for officer safety, (3) the automobile exception, and (4) inevitable discovery.[8]  As detailed herein, all four explanations have fatal shortcomings such that the warrantless search and seizure were impermissible, and the United States has failed to establish the lawfulness of the search and seizure by a preponderance of the evidence.

A.  *Plain View Doctrine*

The first justification raised by the United States was the plain view doctrine.  Upon inspection, that justification is unpersuasive for two primary reasons.  First, the object was not in plain view from the officers' alleged vantage point.  Second, even if it was in plain view, the United States has presented no evidence that the firearm's incriminating character was "immediately apparent."

The plain view doctrine allows for a warrantless seizure of evidence if: (1) [t]he officer is lawfully in a place to plainly view the object; (2) the officer has a lawful right of access to the object itself; and (3) the incriminating character of the evidence must be "immediately apparent." *Horton v. California*, 496 U.S. 128 (1990); *United States v. Jackson*, 131 F.3d 1105, 1108 (4th Cir. 1997).  An object's incriminating character is "immediately apparent" if a police officer, upon seeing it, has probable cause to believe it is "evidence of a crime or is contraband." *Arizona v. Hicks*, 480 U.S. 321, 326-27 (1987).  Whether probable cause existed to believe the item is

---

8 At the suppression hearing, the United States indicated it would no longer pursue the inevitable discovery argument, citing a purported lack of detailed procedure by the Chapmanville Police Officer who would have conducted an ultimate inventory search.  However, because the argument is in the written briefs, and because the argument fails on the merits for reasons not mentioned by the United States, the Court will address it below to ensure the legal standard is explicitly clarified.

associated with criminality is determined under a totality of circumstances.   It requires a "practical, non-technical" probability that incriminating evidence is involved.   *Texas v. Brown*, 460 U.S. 730, 742 (1983).   However, "[i]f ... the police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object," then its incriminating nature is not immediately apparent, and "the plain-view doctrine cannot justify its seizure." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993).

Based on the evidence before the Court, the plain view doctrine did not justify the seizure of the firearm as it was not in plain view.   The Court has reviewed the photograph of the firearm under the passenger seat, and additional photographs submitted as evidence.   The photograph of the firearm, taken from inside the vehicle and not from the vantage point from which the officers claimed to have seen it, depicts a dark-colored firearm entirely confined under a dark and narrow enclosure underneath the passenger seat of the truck.   It also shows that the sunlight entering the vehicle stops well short of where the gun was located, placing the gun in a shadowed area.   Other photographs show that the seat itself stood approximately at the height of the officers' knees when standing upright outside the car.   With this in mind, the Court considered where the officer claimed to have been standing when he saw the firearm in plain view.   Trooper Holden testified he was standing upright, outside the passenger side door, and not bending down or into the truck when he saw the firearm.   Frankly, viewing the images, this line of vision does not appear possible.   The photographs illustrate that even from eye level with the gun, it is completely under the passenger seat and its color blends with the seat and floorboard in the shadowed space.

In addition to the contradictions in evidence and testimony detailed above, the hearing also highlighted further inconsistencies and uncertainties in the United States' evidence.   First, the

9

photographs Trooper Holden took, and importantly, the ones he did not take, raise questions. Trooper Holden took numerous photographs from inside the truck, with the only photograph of the firearm depicting a view from the floorboard.  If the officer had, in fact, initially seen the firearm from the location depicted in that photo, its seizure would have been constitutionally impermissible.   Entering the interior of the truck to obtain a better vantage point to see a concealed area is unquestionably a search beyond the plain view exception.   *United States v. Stansfield*, 109 F.3d 976, 981 (4th Cir. 1997).   If his vantage point from outside the truck allowed him to see the firearm in plain view, and thus justify its seizure, the officer would presumably have sought to photograph that critical detail.   No such photograph was offered into evidence.   Further, despite claiming reliance on the presence of syringe caps on the floorboard, to justify some of his suspicions, he did not take any photographs depicting the caps.

Moreover, Patrolman Hall's testimony contradicted some of the central points of Trooper Holden's testimony, was internally inconsistent at times, and he answered that he did not recall, in response to questions, at least 14 times.   Aside from the frequency with which he did not recall seemingly important details, Trooper Hall claimed to recall certain events with exacting specificity, while not recalling other events in the same timeframe, altogether.

In response to questions, he indicated that he did not recall facts such as whether the passenger had made any furtive movements, how many injection needles he found during his search, whether he found any drugs, or what charge he filed against the passenger of the truck. He could not recall if he ever heard back from central 911 about Mr. Bumgarner's eligibility to drive, what charge was filed against Mr. Bumgarner, whether Trooper Holden had communicated that he was coming to the scene, or whether Trooper Holden had opened the door for Mr.

10

Bumgarner.  He further claimed he did not recall when an additional officer, who is pictured searching the truck with him, arrived on the scene, or whether there were groceries in the cabin of the truck.

Yet, despite this, and the numerous inconsistencies in testimony noted above, he claimed to recall with specificity the precise location where Trooper Holden was standing when he observed the gun, that Holden did not cross the door frame at all when observing the gun, that it was clearly in plain view, that both he and Holden were standing straight up while observing the gun, and his body never crossed into the frame of the door.[9]

He directly contradicted Trooper Holden's repeated assurance that he spoke with Patrolman Hall upon arriving on the scene and that Patrolman Hall informed him of facts that Trooper Holden claimed he knew prior to his interactions with the Defendant.[10]

As a result, the Court finds the credibility of the evidence presented, including whether the weapon could be seen from Trooper Holden's purported vantage point, to be questionable, at best, and therefore concludes that the United States has not proven by a preponderance of the evidence that the firearm was in plain view.

However, even if the Court assumes that Trooper Holden could see the weapon in plain view from outside of the truck and that he did not lean into the truck at all to discover the gun, the plain view justification fails.  There has been no evidence presented that satisfies the third prong of the plain view analysis or, in other words, to indicate that the weapon was immediately

---

9 All of this was stated while acknowledging that the entirety of the firearm was, in fact, completely underneath the seat as reflected in the photograph.

10 In his testimony, and within the United States' briefings, it was asserted that Trooper Holden was aware of Mr. Bumgarner's alleged furtive movements in the car, and purported refusal to comply with Patrolman Hall's efforts to stop him.  In Patrolman Hall's testimony, however, not only did he deny that he and Trooper Holden even had a discussion prior to Trooper Holden approaching Mr. Bumgarner, he directly refuted the insinuation that Mr. Bumgarner had refused to comply or attempted to evade the traffic stop.

11

recognizable as contraband. *See Horton v. California,* 496 U.S. 128 (1990); *United States v. Jackson,* 131 F.3d 1105, 1108 (4ᵗʰ Cir. 1997)

There is nothing under West Virginia law that makes the mere presence of a firearm in a vehicle inherently unlawful, such that it would be immediately recognizable as contraband.   Aside from jurisdictions where mere possession of any firearm in a vehicle is, itself, unlawful, the Court is unaware of any precedent that holds the mere presence of a firearm, without any other fact, is sufficient to justify its full seizure as "contraband" under the plain view doctrine.   There must be other, specific articulable facts establishing probable cause for why the firearm is contraband. Courts have identified a few specific circumstances that would establish probable cause in this context.

The first circumstance where probable cause for plain view seizure may exist is when the facts of the stop leading to the discovery of the firearm provide the requisite probable cause.[11]   If the facts available to the officer, at the time the firearm is seen, establish probable cause that the firearm is contraband, seizure is permissible.   *See, e.g.*, *United States v. Johnson*, 107 Fed.Appx. 322, 327 (4th Cir. 2004); *United States v. Farmer*, 914 F.2d 249 (Table) *2 (4ᵗʰ Cir.   1990).   The facts in this case, however, do not rise to the level of specificity the Fourth Circuit has identified in the past.   In *Johnson*, the officer had tracked multiple controlled telephone conversations about a drug delivery, saw facts indicating a likely drug deal had occurred, and saw a defendant put a bag containing suspected drugs in the car. 107 Fed.Appx. at 327.   Therefore, when the officer saw a firearm in plain view in the car, there was probable cause to believe that the gun was being used

---

11 An additional line of cases illustrates another path to probable cause which is essentially an extension of this. When the reason for the stop or search is such that a gun on the scene is reasonably assumed to be associated with criminal activity, that is sufficient to seize under the plain view doctrine. However, because Mr. Bumgarner was pulled over for a seat belt violation, that line of cases is irrelevant.

for illegal purposes.  *Id.*  Similarly, in *Farmer*, specific articulable facts established probable cause.  The defendant had admitted that an ATF official had informed him that alterations he made to the gun likely made it illegal, and the arresting officer saw alterations in plain view that he, based on his expertise, believed made it illegal.  *Farmer*, 914 F.2d 249 (Table) *2.  None of those types of specific, potentially incriminating facts are present here.  Mr. Bumgarner was pulled over for a seat belt violation, an infraction that would not make the presence of a weapon immediately recognizable as contraband or illegal.   Neither officer testified that they knew he was a felon or had reason to believe that he was utilizing a gun for a prohibited purpose.   While there may have been suspicion, it was not based on the level of specific and articulable facts required for probable cause in this context.

An alternative route to probable cause, necessary to satisfy this prong of the plain view exception, is through what courts have called the collective knowledge doctrine.   As the Fourth Circuit described in *United States v. Wells,* this approach allows the collective knowledge of the supervising and searching officers to be combined to help establish probable cause.   98 F.3d 808, 810 (4th Cir. 1996).   The collective knowledge, however, is limited to officers directly involved in the arrest and search and does not allow for piecing together information known by officers not directly involved in ordering or carrying out the plain view seizure.  *United States v. Patiutka*, 804 F.3d 684, 691 (4th Cir. 2015)*.* As the court stated:

> "[t]he collective-knowledge doctrine "simply directs [a court] to substitute the knowledge of the instructing officer or officers for the knowledge of the acting officer; it does not permit [a court] to aggregate bits and pieces of information from among myriad officers." *United States v. Massenburg*, 654 F.3d 480, 493 (4th Cir.2011).   In *Massenburg*, we rejected a more expansive version of the doctrine that the Government had proposed and that several circuits have adopted because "[u]nder th[at] proposed rule, it would

> be irrelevant that no officer had sufficient information to justify a
> search or seizure." Id. Thus in *Massenburg* we held that the
> instructing officer alone must have sufficient information to justify
> an arrest or search in order for the acting officer to benefit from the
> collective-knowledge doctrine."

*Id*.   Therefore, even if some officers in the broader departments were aware of Mr. Bumgarner's status as a prohibited carrier, the collective knowledge doctrine only includes the knowledge of Patrolman Hall and Trooper Holden.   There is no evidence that either officer individually, or the two of them collectively, knew that Mr. Bumgarner had a prior felony conviction.   There is also no evidence that the weapon met the description of a weapon that had been reported stolen or some other criminal involvement that would have made it immediately recognizable as contraband. Further, there was no evidence presented that the officers even knew with certainty that the weapon belonged to the defendant. Therefore, there was no collective knowledge that established the requisite probable cause.

Several circuits, including the Fifth, Sixth, Eighth, and Tenth, have established an additional circumstance where a temporary seizure under the plain view doctrine may be appropriate, even when the firearm is not obviously contraband when initially seized. *See, e.g.*, *United States v. Gordon*, 741 F.3d 64, 71-72 (10th Cir. 2014); United *States v. Rodriguez,* 601 F.3d 402, 408 (5th Cir. 2010); *United States v. Bishop*, 338 F.3d 623, 626-27 (6th Cir. 2003); *United States v. Malachesen*, 597 F.2d 1232, 1234 (8th Cir. 1979).   However, this temporary seizure is only permissible if it is justified by a legitimate concern for public or police safety. Then, if during that temporary seizure, its contraband nature is discovered, it may be permanently seized as contraband.   The Tenth Circuit, however, highlighted the essential confines of this

14

exception, holding that the temporary seizure cannot extend beyond the time that is "necessary to stabilize the situation and eliminate the risk of immediate harm." *Gordon*, 741 F.3d at 71-72.

Even if the Fourth Circuit adopts a similar temporary seizure exception, the constraint explained by the Tenth Circuit undermines its application.   As detailed extensively in the factual background and discussion of the permissibility of a protective sweep, the officers did not face an immediate threat at the time the firearm was seized.   Patrolman Hall stated he did not believe the truck occupants posed a threat, Mr. Bumgarner was detained in a locked police vehicle, and Ms. Evans was out of the vehicle being monitored by Patrolman Hall to ensure she stayed away from the vehicle.   There are no facts to indicate the firearm posed an immediate threat to officer or public safety at the time it was seized.   Officers cannot simply seize a firearm in plain view, during a warrantless search, for the sole purpose of determining whether it is contraband. Otherwise, the final prong of the plain view analysis would be rendered meaningless.

*B.   Protective Sweep*

The United States also argues that the officers lawfully found and seized the firearm because they were entitled to conduct a protective sweep of the vehicle.   However, Supreme Court precedent eliminates this potential justification given the factual circumstances of the stop, and alternatively, admissions and significant inconsistencies in the officers' testimony preclude the application of his justification.

There is no dispute that for officer safety, law enforcement officers may ask the occupants of a vehicle to exit the vehicle pursuant to a lawful traffic stop.   *Maryland v. Wilson*, 519 U.S. 408, 415 (1997); *Ohio v. Robinette*, 519 U.S. 33, 38-39 (1996).   However, the justification for a limited search following removal is officer safety.   At issue here is not whether it was proper to

remove the occupants, but whether the officers were entitled to conduct a protective sweep at the point they seized the firearm.   They were not.

The United States relied on several Fourth Circuit cases to support this justification. It primarily relied on the decision in *United States v. Holmes*, which allows for a protective sweep of a vehicle where officers believe a suspect is dangerous and there may be easily accessible weapons in the vehicle. 376 F.3d 270, 280 (4th Cir. 2004).   This rule was applicable even when the suspect was handcuffed in the back of a police car.   *Id.* at 278-81.   This decision, and the others relied upon for this proposition, however, were decided prior to the Supreme Court's decision in *Arizona v. Gant*, 556 U.S. 332 (2009), which established a rule which would supersede the *Holmes'* rule under the facts presented here.

In *Gant*, the Court held that a warrantless sweep of a vehicle after the defendant and other occupants were removed from the car and secured out of reach of the passenger compartment was unreasonable. 556 U.S. at 336.   The Court held that this type of search could only be conducted under two specific circumstances: (1) when the vehicle's occupants are "unsecured and within reaching distance of the passenger compartment at the time of the search", or (2) "when it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." *Id.* at 343.   As the Supreme Court noted in *Gant,* the second circumstance is irrelevant when it involves a traffic violation, as there is no additional conceivable evidence of that type of violation in the car. *Id.*

While *Gant* involved a search incident to a lawful arrest, its rule would seemingly apply equally when a defendant, like Mr. Bumgarner, is detained, in handcuffs and locked in the back of a police vehicle following an alleged traffic violation.   The justification of officer safety and

16

securing evidence of the crime in question would apply equally in both scenarios.    Thus, once Mr. Bumgarner was in handcuffs detained in the police vehicle, and Ms. Evans was out of the vehicle being guarded by Patrolman Hall, any potential danger to officers was eliminated and a protective sweep was not justified.

In addition to *Gant*'s mandate, Patrolman Hall's testimony undermines the justification. Despite his testimony that he was trained to believe all individuals he pulls over are "out to kill him,"[12] and his testimony that he witnessed the Defendant make movements prior to the stop, as though he was placing something behind the front passenger seat, he took no steps consistent with a suspicion that the Defendant was dangerous once he stopped the Defendant.   Patrolman Hall testified that he was not fearful about the Defendant, he did not ask if there was a firearm in the truck, he did not ask about the alleged motion to place something behind the seat, he did not ask either the driver or passenger to step out of the truck, and he walked away leaving them in the truck.   He also testified that aside from the moving violation he had no indication they were engaged in further criminal activity. Trooper Holden claimed that he had been told about the Defendant's furtive motion to place something behind a seat, and therefore needed to remove him from the truck, although Patrolman Hall testified that he had not spoken to Trooper Holden before the trooper approached the truck and removed the Defendant.

Further, the Fourth Circuit has been critical of utilizing supposed furtive movements as primary evidence of suspicious behavior.   *See, e.g., United States v. Massenberg*, 654 F.3d 480, 491 (4th Cir. 2011); *United States v. Foster*, 634 F.3d 243, 246-47 (4th Cir. 2011).[13]   Instead,

---

12  December 2, 2021, Tr., p. 37:18 (Document 48)
13  While the cases cited by the United States to support this proposition do mention furtive movements, their facts are not analogous to the instant case.   In them, the Fourth Circuit found furtive movements and other suspicious behavior may create justification for a pat down and detention, however, furtive motions were not the facts utilized to

Fourth Circuit precedent points to the need for multiple articulable facts.   To meet that requirement, the United States cites primarily to Mr. Bumgarner's attempt to evade the traffic stop, and the syringe caps in the vehicle.   As detailed above, the Court has substantial reasons to question the credibility of the evidence as to both.   First, Patrolman Hall directly disputed the insinuation that Mr. Bumgarner sped up or attempted to flee the traffic stop, and he denied telling Trooper Holden that Mr. Bumgarner had done so.   Second, while the officers both claimed to have seen syringe caps on the floor of the truck, there is no corroborative evidence to support this contention, and these caps are conspicuously absent from the photographs and seemingly from the evidence collected from the scene.

However, both the Defendant and the passenger were out of the truck, restrained and/or kept away from the cabin of the truck and no longer posed any conceivable threat.   Therefore, because any reasonable concern for officer safety was neutralized, no justification for a protective sweep of the vehicle existed.

## C.   Automobile Exception

The United States' argument that the automobile exception justifies the sweep is equally unpersuasive.   The automobile exception permits the police to conduct a warrantless search of a vehicle only if the vehicle can be easily moved, and the officers have probable cause to believe it contains contraband.   *United States v. Davis*, 997 F.3d 191, 201 (citations omitted).   The

---

justify a search or sweep of the vehicle without significant additional factors being present.  *See United States v. Fridie*, 442 Fed.Appx. 839, 841 (4th Cir. 2011) (citing an odor of marijuana emanating from the truck to create probable cause for a search); *United States v. Spearman,* 254 Fed.Appx. 178, 180-81 (4th Cir. 2007) (citing a tip that drugs were being dealt out of the suspect's car, and that the suspect falsely claiming that he was continuing to make furtive movements under the seat to find his cellphone despite his cellphone sitting in his lap, as additional factors to establish probable cause for a sweep); *United States v. Barnes*, 153 Fed.Appx. 232, 234-35 (4th Cir. 2005) (citing a tip that someone had entered the suspect's car holding a gun, and then the suspect failed to turn off the car or exit the vehicle prior to making furtive motions under his seat, to justify the sweep).

exception can exist even when it is the passenger rather than the driver who is suspected of criminal activity.   *United States v. Hensley*, 469 U.S. 221, 235 (1985).   Because Patrolman Hall conceded that he did not believe either Mr. Bumgarner or Ms. Evans were engaged in any criminal conduct besides the seat belt violation, the only conceivable justification is Trooper Holden's contention that there were syringe caps in the vehicle and Ms. Evans was acting nervous.   The evidence does not support the existence of probable cause.

While the officers claim that they had seen syringe caps in the passenger compartment, as noted above, no photographs of the caps were ever taken, and no testimony regarding the seizure of the caps or other evidence has been submitted to prove their existence.   Even if the Court assumes the presence of syringe caps could have supported probable cause, the extensive credibility concerns detailed earlier, and the lack of corroborating information, undermines a finding of probable cause.   Further, while the officers did ultimately find at least one syringe in Ms. Evans' purse, this was located after the firearm had been seized and is, therefore, irrelevant to the analysis.   Additionally, the truck did not belong to either occupant and had been borrowed to obtain groceries.   Ms. Evans was not under surveillance by law enforcement for drug use at this time, and there were no reports of her using drugs in this truck.   Finally, Town of Chapmanville Municipal Ordinance No. 529.07(B) only prohibits the possession of syringes if used for administering habit-forming drugs unless authorized.   There has been no evidence that the needle that was ultimately discovered was discovered with illegal or habit-forming drugs, and there is no evidence that Ms. Evans ever told the officer she used it to administer illegal or habit-forming drugs or that other contraband items could be found in the truck.

19

Despite the United States' reliance on *Wyoming v. Houghton*, 526 U.S. 295 (1999), to assert that probable cause existed, the holding is distinguishable in key ways.   First, the syringe found in *Wyoming* was discovered *prior* to the search of the car, whereas the syringe in Ms. Evans' purse was found *after* the search of the truck.   Additionally, the syringe in *Wyoming* was observed in the driver's front pocket, whereas here it was secured inside a purse.   Critically, the defendant in *Wyoming* specifically admitted to law enforcement that he used the syringe for the purpose of injecting drugs.

Ultimately, given credibility considerations, the fact that the syringe was located after police had conducted the search in dispute, and the lack of additional facts indicating likely contraband in the vehicle, the evidence falls short of establishing the requisite probable cause to justify a search under the automobile exception.

### D.  Inevitable Discovery

The United States further asserts that the seizure was permissible under the doctrine of inevitable discovery.   In its brief, the United States asserts that the evidence should be admitted under the doctrine of inevitable discovery because neither Mr. Bumgarner nor Ms. Evans could legally drive the truck away from the scene.   Therefore, it argues that the gun would have been ultimately discovered during an inventory search.[14]  This, however, ignores the facts of the case, relevant West Virginia and Fourth Circuit precedent, and would require far too many unsupported assumptions.

---

14 The United States asserted that the Chapmanville Police Department did not have sufficiently fixed inventory procedures to utilize this justification.   As discussed herein, while that may be true, this argument would fail regardless of the Chapmanville Police Department's inventory procedures.

To establish inevitable discovery, the government may not rely on a string of assumptions and conjecture. *United States v. Thomas,* 955 F.2d 207, 209 (4th Cir. 1992).   Further, West Virginia law requires a police officer to permit a driver to arrange for a vehicle to be moved prior to initiating an inventory search and effort to impound.   *State v Perry*, 174 W. Va. 212, Syl. Pt. 2 (W. Va. 1984).   Here, the truck was safely parked in a parking lot, and not obstructing traffic.   It was not reported stolen or used in the commission of a crime such that it needed to be seized for evidentiary purposes.   The officer was aware that Mr. Bumgarner had borrowed the truck from Mr. McCloud and could have allowed him to call Mr. McCloud to come and get it.   Given these facts, the possibility of an inventory search is far too speculative to be used as justification for inevitable discovery.

The Court, having assessed the credibility of the evidence and having assessed the legal arguments presented by the parties, finds because no legal justification existed for the search, the search of the truck and subsequent seizure of the gun violated Mr. Bumgarner's rights under the Fourth Amendment.   Therefore, the evidence seized from the scene and the evidence derived as a result of that seizure must be suppressed.

## CONCLUSION

Wherefore, after thorough review and careful consideration, the Court **ORDERS** that the *Defendant's Motion to Suppress Evidence* (Document 25) be **GRANTED,** and that the evidence detailed in the *Motion* be suppressed.   Further, the Court **ORDERS** in the event this is the only charge on which the Defendant, David Lee Bumgarner, is being held, that he be **RELEASED IMMEDIATELY**.

The Court **DIRECTS** the Clerk to send a copy of this Order to the Defendant and counsel, to the United States Attorney, to the United States Probation Office, to the Office of the United States Marshal.

ENTER:    December 20, 2021

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA

22